*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* KLIMP, Minors.

UNPUBLISHED
March 13, 2026
11:37 AM

Nos. 375799; 375800
Wexford Circuit Court
Family Division
LC No. 24-031319-NA

Before: LETICA, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

Respondent-mother and respondent-father appeal as of right an order terminating their parental rights to four adopted children, MK, TK, KK, and OK. The court terminated their parental rights to MK and TK under MCL 712A.19b(3)(b)(*i*) (physical injury caused by parent), (j) (reasonable likelihood of harm if child returned to parent), (k)(*iii*) (severe physical abuse of child or sibling), (k)(*iv*) (serious impairment of an organ or limb of the child or a sibling), and (k)(*v*) (life-threatening injury to child or sibling). It terminated respondents' parental rights to KK and OK under MCL 712A.19b(3)(k)(*iii*), (*iv*), and (*v*).[1] For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

In 2024, MK was admitted to a Tennessee[2] hospital following a seizure. Subsequent investigation led the Department of Health and Human Services (DHHS) to initiate a petition

---

[1] The case also involved three additional children, DK, THK, and FK, who were biological children of respondents. With regard to these children, the trial court found that there were statutory grounds for termination under MCL 712A.19b(3)(k)(*iii*), (*iv*), and (*v*), but it declined to terminate respondents' parental rights to these three children after conducting an analysis of their best interests.

[2] The family was apparently visiting Tennessee temporarily.

seeking immediate termination of respondents' parental rights to their seven minor children. Medical evidence established that both MK and TK were gravely underweight, exhibited stunted growth, and presented with neurological abnormalities consistent with severe malnutrition. A treating physician opined that, absent intervention, MK and TK faced a substantial risk of mortality while in respondents' custody. DHHS further adduced evidence that respondents compelled MK and TK to consume pureed food from bottles and to wear diapers, notwithstanding their ages rendering such measures developmentally inappropriate. Additional evidence demonstrated that MK and TK were confined to locked rooms, required to sleep in plastic storage containers— sometimes without blankets—and subjected to punitive measures including exposure to extreme cold without clothing, resulting in MK presenting with symptoms of frostbite at the time of hospital admission. The remaining children were witnesses to, and at times participants in, the maltreatment. Following placement in foster care, MK and TK rapidly achieved age-appropriate dietary habits, gained weight, and discontinued use of diapers.

The trial court determined that respondents had perpetrated severe abuse against MK and TK and accordingly ordered the termination of respondents' parental rights with respect to those children. The court also terminated respondents' parental rights to KK and OK—both adopted children—upon finding that their behavioral issues rendered them vulnerable to harm if returned to respondents' care. By contrast, the court declined to terminate parental rights concerning the three biological children, citing their placement with grandparents in stable familial environments and the anticipated establishment of guardianships.

Throughout the proceedings below, respondents remained incarcerated in Tennessee, facing criminal prosecution arising from their treatment of MK and TK. Notwithstanding their incarceration, respondents participated in the child protective proceedings via videoconference.

## II. ANALYSIS

### A. AGGRAVATED CIRCUMSTANCES

Respondents assert that all four termination orders should be vacated on the grounds that, while DHHS alleged aggravated circumstances and sought termination at the initial disposition, the court did not render a finding of aggravated circumstances until the termination hearing was already underway—after respondents' prior pleas of no contest to jurisdiction. Respondents maintain that this procedure was improper because, in their view, a finding of aggravated circumstances must occur at the inception of the proceedings. They further contend that the court's failure to do so deprived them of their statutory right to reasonable reunification efforts. This argument, however, is predicated on an incorrect interpretation of the governing law and is therefore unavailing.

MCL 712A.19a(2) states, in pertinent part:

Reasonable efforts to reunify the child and family must be made in all cases except if any of the following apply:

(a) There is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in section 18(1) and (2) of the child protection law, 1975 PA 238, MCL 722.638.

Aggravated circumstances include: "(*iii*) [b]attering, torture, or other serious physical harm," "(*iv*) [l]oss or serious impairment of an organ or limb," and "(*v*) [l]ife threatening injury" to a child or sibling of the child. MCL 722.638(1)(a). The trial court concluded that all these circumstances applied.

Respondents acknowledge on appeal that the trial court made the requisite findings of aggravated circumstances during the initial dispositional hearing, concurrently with its determination that statutory grounds for termination had been established pursuant to MCL 712A.19b(3). The record does not reflect any error in this regard. Our Supreme Court has held that the aggravated-circumstances determination mandated by MCL 712A.19a(2)(a) must occur at the initial dispositional hearing. See *In re Barber/Espinoza*, ___ Mich ___; ___ NW3d ___ (2025) (Docket No. 167745), slip op at 16. Furthermore, it is well-settled that a trial court may not terminate parental rights at the initial disposition absent a finding that one of the exceptions under MCL 712A.19a(2) applies. See *In re Walters*, ___ Mich App ___; ___ NW3d ___ (2025) (Docket No. 369318), slip op at 1. In this matter, the trial court did not terminate respondents' parental rights at the initial disposition without first determining that at least one enumerated exception under MCL 712A.19a(2) was present. Accordingly, respondents have failed to establish any reversible error. *Id.*; *In re Barber/Espinoza*, ___ Mich at ___; slip op at 16.

Respondents rely on MCR 3.965(C)(4) to argue that the trial court was obligated to make an aggravated circumstances determination at the inception of the proceedings. This reliance is misplaced. MCR 3.965 governs preliminary hearings and, in relevant part, obligates the trial court to determine "whether reasonable efforts to prevent the *removal* of the child have been made or that reasonable efforts to prevent *removal* are not required" only in situations where the court has placed a child with an individual other than the custodial parent, guardian, or legal custodian at the preliminary hearing. (Emphasis added.) The rule does not require the court to make findings under MCL 712A.19a(2) at this stage. Respondents' argument on this issue conflates the statutory requirements for findings regarding reasonable efforts to prevent removal with those relating to reasonable efforts toward reunification—distinct determinations that occur at separate procedural junctures. See *In re Barber/Espinoza*, ___ Mich at ___; slip op at 16 ("At the preliminary hearing, the trial court must determine whether reasonable efforts have been made to prevent *removal*, MCR 3.965(C)(4), not whether reasonable reunification efforts between removal and termination may be excused, MCL 712A.19a(2)."). Accordingly, we find that this argument is devoid of both legal and factual merit. Therefore, respondents are not entitled to any relief on this ground.

## B. ZOOM APPEARANCE

Respondents further assert on appeal that their due process rights were infringed upon by being compelled to appear via Zoom at both the partial[3] adjudication trial and the dispositional

---

[3] Respondents pled no contest mid-trial.

hearing. As a threshold matter, due process claims present questions of law subject to de novo review by this Court. *In re Sanborn*, 337 Mich App 252, 268; 976 NW2d 44 (2021).

It is undisputed that, at all relevant times during these child protective proceedings, respondents were incarcerated in Tennessee on pending criminal charges. Tennessee authorities refused to permit respondents to travel out of state to attend the Michigan proceedings in person. Consequently, respondents participated in the Michigan proceedings via videoconference. Following respondents' motion to appear in person at the adjudication trial, the trial court stated that it was unaware of any legal authority empowering it to compel Tennessee officials to produce respondents physically or obligating the court to stay the child protective proceedings pending respondents' in-person appearance. The court indicated it would provide reasonable accommodations for respondents' videoconference participation, including enhanced audio arrangements and opportunities for confidential attorney conferences. The court further acknowledged its lack of control over the duration of the Tennessee incarceration and articulated its obligation to balance the parents' interest in personal appearance against the children's interest in expeditious resolution of the proceedings.[4] On appeal, respondents advance the erroneous contention that due process guarantees an absolute right to physical presence at child protective proceedings in all circumstances. As recognized by the trial court, while in-person attendance is generally preferable, the impediment to physical appearance in this instance was respondents' incarceration in a different jurisdiction. Michigan law is clear that physical presence at such proceedings does not constitute an absolute right. See *In re Vasquez*, 199 Mich App 44, 49; 501 NW2d 231 (1993).

It is axiomatic that parents possess a fundamental liberty interest in the care, companionship, custody, and management of their children, as safeguarded by the Fourteenth Amendment. *In re Sanders*, 495 Mich 394, 409; 852 NW2d 524 (2014). Nevertheless, this right is not absolute. The state maintains a legitimate and compelling interest in safeguarding the moral, emotional, mental, and physical welfare of minors, and, under certain circumstances, may properly separate neglectful parents from their children. *Id*. at 409-410. Procedural due process mandates that, prior to state interference with a fundamental right, at least minimal procedural protections must be afforded. *Id*. at 410. Nonetheless, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *In re Brock*, 442 Mich 101, 111; 499 NW2d 752 (1993) (quoting *Mathews v Eldridge*, 424 US 319, 332, 334; 96 S Ct 893, 901, 902 (1976)). Fundamental fairness is the touchstone of due process, assessed by reference to applicable precedent and a careful balancing of the competing interests implicated in each case. *In re Rood*, 483 Mich 73, 92; 763 NW2d 587 (2009) (opinion by Corrigan, J.). The essential requirement is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Id*. To ascertain the specific procedural protections required, courts apply the familiar balancing test set forth in *Mathews*, which considers the following factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used,

---

[4] Respondent-mother sought interlocutory leave to appeal, which this Court denied. *In re Klimp*, unpublished order of the Court of Appeals, entered October 30, 2024 (Docket No. 372938).

and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." [*In re Brock*, 442 Mich at 111, quoting *Mathews*, 424 US at 335.]

Here, the private interest implicated is the respondents' fundamental right to the custody of their children. We certainly recognize this as a paramount constitutional right. And while the risk of erroneous deprivation of such an interest may be heightened where a respondent parent is wholly absent from proceedings and unrepresented by counsel. See *In re Render*, 145 Mich App 344, 349; 377 NW2d 421 (1985) ("The risk of an erroneous deprivation is increased in the parent's absence.") But those circumstances are not present here. The record demonstrates that respondents participated via videoconferencing technology and were represented by counsel, who advocated vigorously for their interests. Importantly, the trial court affirmatively facilitated respondents' remote participation in the Michigan proceedings, accommodating respondents despite their incarceration in another state.

The State of Michigan's compelling interest in safeguarding the welfare of the children in this matter is likewise of the highest order. See *In re Brock*, 442 Mich at 112-113. Beyond the potentially considerable financial and administrative burdens associated with transporting respondents from Tennessee to Michigan, the record suggests that securing their physical presence was effectively precluded by determinations made by Tennessee officials.

Our review of the record in this matter leads us to conclude that the trial court did not deprive respondents of a fundamentally fair process or a meaningful opportunity to be heard by permitting their participation through contemporary videoconferencing technology. See *In re Rood*, 483 Mich at 92; *In re Brock*, 442 Mich at 111. This Court recognized decades ago that, considering then-existing telecommunications, alternatives to physical presence could satisfy due process requirements for incarcerated parents at dispositional hearings. *In re Vasquez*, 199 Mich App at 48-49. That observation is even more salient given present-day technological advances. Furthermore, respondents have wholly failed to engage with the *Mathews* factors in their appellate briefing and have not demonstrated any deprivation of due process in this case, leading us to conclude that respondents are not entitled to relief on this issue.

C. STATUTORY GROUNDS AND BEST INTERESTS REGARDING OK AND KK

Respondents further assert that the trial court committed reversible error by invoking the doctrine of anticipatory neglect as a predicate for terminating their parental rights to OK and KK. Additionally, respondents challenge the sufficiency of the evidentiary foundation upon which the trial court determined that termination of their parental rights served the best interests of OK and KK.

The statutory framework governing termination of parental rights requires the trial court to make an initial determination, by clear and convincing evidence, that at least one statutory ground for termination exists. MCL 712A.19b(3). Appellate review of both the trial court's factual findings and its ultimate determination regarding the existence of a statutory ground is conducted

under the clear error standard. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). A finding is deemed clearly erroneous when, despite some evidentiary support, the reviewing court is left with a definite and firm conviction that an error has been made.

This Court also reviews for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). The trial court terminated respondents' parental rights to KK and OK under MCL 712A.19b(3)(k)(*iii*), (*iv*), and (*v*).

MCL 712A.19b(3) states, in pertinent part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (k) The parent abused the child or a sibling of the child, the abuse included 1 or more of the following, and there is a reasonable likelihood that the child will be harmed if returned to the care of the parent:
>
> * * *
>
> (*iii*) Battering, torture, or other severe physical abuse.
>
> (*iv*) Loss or serious impairment of an organ or limb.
>
> (*v*) Life-threatening injury.

Solely for the sake of this argument, respondents concede that the statutory grounds for termination are satisfied as to MK and TK. However, they assert that the trial court committed reversible error by extending these grounds to OK and KK, given that the alleged abuse was confined to MK and TK. Respondents challenge the applicability of the doctrine of anticipatory neglect, which holds that a parent's treatment of one child is probative of the likely treatment of another. See *In re LaFrance*, 306 Mich App 713, 730; 858 NW2d 143 (2014). Respondents analogize this matter to *In re LaFrance*, where this Court reversed termination of parental rights as to three older children based solely on medical neglect of the youngest child, noting the absence of evidence that either parent had ever abused or neglected the older siblings. *Id.* Unlike *LaFrance*, however, this matter involves two minor children who directly witnessed egregious and deliberate abuse perpetrated against their older siblings. Respondents further disregard the controlling statutory language of MCL 712A.19b(3)(k), which expressly authorizes termination of parental rights where a child's sibling has been abused by a parent.[5] Under these facts, respondents have failed to establish that the trial court's findings regarding the statutory grounds for termination were clearly erroneous. See *In re Mason*, 486 Mich at 152.

---

[5] "Sibling" means "a child who is related through birth or adoption by at least 1 common parent." MCL 712A.13a(1)(*l*).

Respondents also contend that the trial court erred by finding that it was in the best interests of OK and KK to terminate respondents' parental rights. "If a trial court finds that a statutory basis for terminating parental rights exists by clear and convincing evidence, it is required to terminate parental rights if it finds from a preponderance of evidence on the whole record that termination is in the children's best interests." *In re Brown/Kindle/Muhammad*, 305 Mich App 623, 637; 853 NW2d 459 (2014) (quotation marks and citation omitted); see also MCL 712A.19b(5).

The trial court should weigh all the evidence available to determine the children's best interests. To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. *In re White*, 303 Mich App 701, 713-714; 846 NW2d 61 (2014) (quotation marks and citations omitted).]

The trial court's conclusion regarding the best interests of OK and KK is amply supported by the evidentiary record. The foster-care supervisor testified that MK and TK were subjected to sustained and severe abuse. She further noted that the other two adopted children, KK (eight at the time of the hearing) and OK (six), not only witnessed this abuse but, according to forensic interviews, displayed troubling perceptions of such conduct as normative.[6] For instance, OK indicated that MK and TK "liked" sleeping in "buckets," and sometimes assisted in feeding them with bottles. KK stated that it was "okay" for MK and TK to sleep in taped-shut totes, as this prevented their escape from the home. The supervisor opined that, by witnessing and at times participating in the maltreatment of their siblings, KK and OK suffered significant emotional and psychological harm.

KK and OK were placed together in a pre-adoptive foster home and were doing well, although they had some emotional issues such as yelling, screaming, and hitting. KK and OK had bonds with their foster parents. They had been in care for over a year. The foster-care supervisor believed it was in the best interests of the children for respondents' parental rights to be terminated. She said that all the children were being looked after appropriately in their placements. KK and OK's foster mother said that the two children were doing well in her home and excelling at school. She said that they were "thriving" and that she and her husband were willing to adopt them.[7]

Notably, KK and OK exhibited emotional and behavioral disturbances, including yelling, screaming, and hitting. Under these circumstances, KK and OK were similarly situated to MK

---

[6] An expert psychologist stated that witnessing what occurred to MK and TK "could not not have impact," such as causing a child to conflate what is normal or abnormal.

[7] It is also of note that the children's guardian ad litem advocated for terminating respondents' parental rights to KK and OK.

and TK and thus exposed to a comparable risk of harm if returned to respondents' care. Respondents' purported justification for the abuse of MK and TK centered on perceived behavioral issues, further underscoring the peril faced by the remaining children. Moreover, unlike the three biological children, KK and OK were not placed with relatives, a factor which, under *In re Olive/Metts*, 297 Mich App at 43, might otherwise weigh against termination.

Considering all relevant circumstances, specifically the egregious treatment inflicted upon the children by their parents, the trial court did not commit clear error in determining that termination of the respondents' parental rights with respect to OK and KK served the best interests of the children. *In re Olive/Metts*, 297 Mich App at 40.

Affirmed.

/s/ Anica Letica
/s/ Stephen L. Borrello
/s/ Michelle M. Rick